**In the United States District Court
for the District of Kansas**

———————

Case No. 19-cv-02085-TC-JPO

———————

UNITED STATES OF AMERICA,
EX REL. EDWARD ERNST JR.,

*Plaintiff*

v.

HCA HEALTHCARE, INC., ET AL.,

*Defendants*

———————

## MEMORANDUM AND ORDER

Plaintiff Edward Ernst Jr. brought this suit against Defendants for alleged false claims to Medicare and Tricare for physical therapy services in violation of the False Claims Act (FCA), 31 U.S.C. § 3729(a)–(b). Defendants moved to dismiss the claims, arguing that Ernst's Second Amended Complaint failed to cure deficiencies that led Judge Lungstrum to dismiss the First Amended Complaint.[1] For the following reasons, Defendants' Motion to Dismiss is granted in part and denied in part.

**I**

Edward Ernst Jr. first brought this *qui tam* FCA action in 2019. Doc. 1. The government declined to intervene, Doc. 9, and Ernst continued the litigation. Since then, he has amended his original complaint twice. Docs. 29 & 54. The Second Amended Complaint alleges that Defendants engaged in four fraudulent schemes to bill Medicare and Tricare for noncompliant treatment practices. Doc. 54. Defendants seek dismissal of all claims under Fed. R. Civ. P. 12(b)(6) for failure to

---

[1] *See United States ex rel. Ernst v. HCA HealthCare, Inc.*, No. 19-2085, 2020 WL 6868775 (D. Kan. Nov. 23, 2020)

state a claim. Specifically, Defendants argue that the complaint fails to satisfy the pleading requirements of both Rule 8(a) and Rule 9(b). *See* Doc. 68.

## A

To survive a motion to dismiss for failure to state a claim, a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief" from each named defendant. Fed. R. Civ. P. 8(a); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

The Tenth Circuit has summarized two "working principles" that underlie this standard. *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). First, the Court ignores legal conclusions, labels, and any formulaic recitation of the elements. *Kan. Penn Gaming*, 656 F.3d at 1214. Second, the Court accepts as true all remaining allegations and logical inferences and asks whether the claimant has alleged facts that make his or her claim plausible. *Id.*

A claim need not be probable to be considered plausible. *Iqbal*, 556 U.S. at 678. But the facts viewed in the light most favorable to the claimant must move the claim from merely conceivable to actually plausible. *Id.* at 678–80. The "mere metaphysical possibility that *some* plaintiff could prove *some* set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims." *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).

Plausibility is context specific. The requisite showing depends on the claims alleged, and the inquiry usually starts with determining what the plaintiff must prove at trial. *See Comcast Corp. v. Nat'l Assoc. of African Am.-Owned Media*, 140 S. Ct. 1009, 1014 (2020). The nature and complexity of the claim(s) define what plaintiffs must plead. *Cf. Robbins v. Oklahoma*, 519 F.3d 1242, 1248–49 (10th Cir. 2008) (comparing the factual allegations required to show a plausible personal injury claim versus a plausible constitutional violation).

In fraud cases, Rule 9(b) requires that plaintiffs also plead claims with "particularity," though mental conditions like intent and knowledge may be alleged generally. This requirement "afford[s]

2

defendant[s] fair notice of . . . claims and the factual ground[s] upon which [they] are based." *United States ex rel. Polukoff v. St. Mark's Hosp.*, 895 F.3d 730, 745 (10th Cir. 2018) (alteration in original) (quoting *United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1172 (10th Cir. 2010)).

Although Rule 9(b)'s particularity requirement is more stringent than Rule 8(a)'s requirements, the Tenth Circuit has made clear that "claims under the FCA need only show the specifics of a fraudulent scheme and provide an adequate basis for a reasonable inference that false claims were submitted as part of that scheme." *Polukoff*, 895 F.3d at 745 (quoting *Lemmon*, 614 F.3d at 1172). Thus, for FCA claims, Rules 8(a) and 9(b) join to form the general pleading requirements. *Lemmon*, 614 F.3d at 1171. In practice, this means that FCA claims must "provid[e] factual allegations regarding the who, what, when, where and how of the alleged claims." *Lemmon*, 614 F.3d at 1171. For claims that fail Rule 9(b), courts may consider whether any deficiency resulted from the plaintiff's inability to access information in the defendant's exclusive control. *Polukoff*, 895 F.3d at 745.

**B**

Ernst claims that Defendants fraudulently caused the United States government to pay out sums of money in violation of the FCA. Under that statute, liability extends to anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" to the government, or who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A)–(B). To bring an FCA action, a plaintiff must allege facts that the defendant (i) made a false statement or engaged in a fraudulent course of conduct, (ii) with the requisite scienter, (iii) that is material, and (iv) that results in a claim to the government. *United States ex rel. Janssen v. Lawrence Mem'l Hosp.*, 949 F.3d 533, 539 (10th Cir. 2020). The FCA applies to Medicare and Tricare claims. *Polukoff*, 895 F.3d at 735 n.1.

A complaint must provide the defendant with notice of the specific ways in which a submitted claim was false or fraudulent. *Polukoff*, 895 F.3d at 745. Under the FCA, a "false or fraudulent" claim may be either factually false or legally false. *Id.* at 741. Factually false claims involve an incorrect description of services provided (or never provided). *Lemmon*, 614 F.3d at 1168. Legally false claims generally involve falsely

3

certifying compliance with a statute, regulation, or contractual provision as a condition of payment. *Id.*

False certifications may be either express or implied. *Polukoff*, 895 F.3d at 741. Express false certification occurs when a claim requestor falsely certifies compliance—as a prerequisite to payment—with a particular statute, regulation, or contractual term. *Id.* (citing *United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*, 543 F.3d 1211, 1217 (10th Cir. 2008)). This does not require a formal certification statement, but the claims must contain express falsehoods. *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1998–2001 (2016) (contrasting implied false certification with express false certification); *see also Lemmon*, 614 F.3d at 1170–72.

Implied false certifications, however, do not require courts to examine the defendant's actual statements to the government. *Lemmon*, 614 F.3d at 1168. Instead, courts look at the underlying contracts, statutes, or regulations to determine whether compliance is a prerequisite to the government's payment. *Id.* For example, if a service provider submits a claim that includes specific representations about the services rendered—and fails to disclose noncompliance with material statutory, regulatory, or contractual requirements—the claim is legally false under a theory of implied false certification. *Escobar*, 136 S. Ct. at 2001.

A plaintiff must also establish that the defendant acted "knowingly." 31 U.S.C. § 3729(a)(1)(A)–(B). The FCA defines knowingly to "mean that a person, with respect to information[] (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." *Id.* at § 3729(b)(1)(A). This knowledge, unlike other aspects of alleged fraudulent behavior, "may be alleged generally." Rule 9(b). "[P]roof of specific intent to defraud" is not required. 31 U.S.C. § 3729(b)(1)(B). "Alleged generally" is less demanding than the particularity otherwise required, but these general allegations must still comply with Rule 8(a). *Iqbal*, 556 U.S. at 686–87. And Rule 8(a) requires more than "plead[ing] the bare elements" of a claim. *Id.* at 687.

Finally, a plaintiff must show that a falsehood was "material" to the government's payment. A knowingly false claim is considered material when it has "a natural tendency to influence, or [is] capable of influencing, the payment . . . of money." 31 U.S.C. § 3729(b)(4). This

inquiry is often holistic, looking to the effect on the behavior of the government entity receiving the misrepresentation. *Escobar*, 136 S. Ct. at 2002. Where FCA liability is based on noncompliance with regulatory or contractual provisions, relevant factors include (i) whether the government consistently refuses to pay similar claims based on the noncompliance, or whether the government continues to pay claims despite knowledge of the noncompliance; (ii) whether the noncompliance goes to the "very essence of the bargain" or is only "minor or insubstantial"; and (iii) "whether the government has expressly identified a provision as a condition of payment." *Janssen*, 949 F.3d at 541 (citing *Escobar*, 136 S. Ct. at 2003 & n.5).

## C

Ernst's First Amended Complaint was dismissed without prejudice. *United States ex rel. Ernst v. HCA HealthCare, Inc.*, No. 19-2085, 2020 WL 6868775 (D. Kan. Nov. 23, 2020); Doc. 51. Judge Lungstrum held that the complaint failed under Rule 9(b). Specifically, Ernst did not explain *how* any allegedly false claims were false (*i.e.*, the complaint lacked a theory of falsity). Doc. 51 at 11. Likewise, Ernst failed to plead facts with sufficient particularity for the underlying schemes themselves. *Id.* at 12. Because the complaint did not satisfy Rule 9(b), Judge Lungstrum did not resolve Defendants' Rule 8(a) arguments. Nevertheless, his order provided a thorough overview of the pleading requirements for filing legally sufficient claims. After dismissal, Ernst again amended his complaint. Doc. 54.

The Second Amended Complaint alleges four fraudulent schemes to submit false reimbursement claims to Medicare and Tricare.[2] Each Defendant's precise involvement in each scheme is unclear. Yet Ernst asserts that the complaint's collective references to "Defendants" are appropriate "because each of the Defendants had a role in the fraud, and they all benefited from it." Doc. 76 at 4 n.2. The facts, however, suggest that there are two distinct groups of defendants. The HCA

---

[2] Tricare is a managed healthcare program that operates as a supplement to the Civilian Health and Medical Program of the Uniformed Services. *See* 32 C.F.R. §§ 199.4 & 199.17(a). For this motion, the Medicare/Tricare distinction is not important.

entities[3] provided administrative and billing services. They did not see patients and had no firsthand knowledge of the services provided. The College Park entities[4] provided therapy services, generated treatment records, and submitted "fee slips" to the HCA entities for eventual payment requests to the government.

**1**

Ernst was a physical therapy technician for College Park Family Care in Overland Park, Kansas, from April 2017 to August 2018.[5] Doc. 54 at ¶¶ 23–24. Some College Park Family Care employees, like Ernst, also worked at College Park PT facilities. *Id.* at ¶ 15. Both entities provided physical therapy services to individuals, including Medicare or Tricare beneficiaries. *Id.* at ¶ 13. Defendant HCA owned and controlled the College Park entities, while HCA Midwest (a division of HCA) ran and operated them. *Id.* at ¶¶ 9–10. According to the Second Amended Complaint, Ernst's employment relationship with Defendants was limited to the College Park entities. *Id.* at ¶¶ 23–26, 33. In fact, aside from voicing a complaint to HCA Midwest's compliance director, *id.* at ¶ 136, Ernst alleges no interaction with the HCA entities.

Ernst's duties included patient scheduling, insurance pre-authorizations, collecting payments, reviewing information on patient fee slips, and submitting those fee slips to HCA's billing department for later billing to insurance companies and Medicare and Tricare. Doc. 54 at ¶ 25. Ernst discovered Defendants' allegedly fraudulent schemes while performing these duties. According to Ernst, each scheme relied on a combined system of electronic medical records and fee slips. *Id.* at ¶¶ 26–31. After a patient visit, the physical therapist entered treatment notes, codes, and the number of treatment units provided into

---

[3] The HCA entities are HCA Healthcare, Inc., and Midamerica Division, Inc., d/b/a HCA Midwest Health.

[4] The College Park entities are College Park Ancillary, LLC, d/b/a College Park Physical Therapy (College Park PT) and Overland Park Surgical Specialties, LLC, d/b/a College Park Family Care Center Physicians Group (College Park Family Care).

[5] Physical therapy techs are unlicensed employees who may assist physical therapists but do not provide direct treatment. Doc. 54 at ¶ 72. In contrast, a physical therapy assistant is a licensed clinician who may perform some therapy services. *See id.* at ¶ 23 & n.1.

WebPT, a billing and medical-records software. *Id.* at ¶¶ 26–27. The codes corresponded to the Current Procedural Terminology (CPT) coding system and identified the therapy services provided. *Id.* at ¶¶ 49–50. The therapist then electronically signed the medical record and generated a patient's "daily note/billing sheet." *Id.* at ¶ 28. That sheet was used to create a fee slip, which included the therapist's initials. *Id.* at ¶ 29. The initials were later used to obtain the therapist's National Provider Identifier for billing insurers. *Id.* The fee slips were sent to HCA's billing department for eventual payment requests to patients' insurers, including Medicare and Tricare. According to Ernst, these fee slips were the only way that the College Park entities communicated to HCA's billing department what needed to be billed to patients' insurers. *Id.* at ¶ 31.

**PT-tech scheme.** Ernst alleges that Medicare policy prohibits payment for services performed by techs, regardless of the level of supervision by a therapist or assistant, because treatment by a tech is not considered "reasonable and necessary." Doc. 54 at ¶¶ 57–58 (citing Medicare Benefit Policy Manual, Ch. 15 §§ 220, 230). Likewise for Tricare. *Id.* at ¶ 71 (citing 32 C.F.R. 199.6).

Ernst alleges that, despite these policies, Defendants submitted claims to Medicare and Tricare for tech services under the guise that they were performed by physical therapists. Doc. 54 at ¶¶ 72–99. Specifically, the College Park entities trained their techs to perform five therapy services (mechanical traction, paraffin baths, ultrasounds, manual therapy, and electrical stimulation). *Id.* at ¶¶ 73–74. Once trained, the techs were assigned to perform the treatments on patients. Yet they were instructed not to enter any information into the WebPT software. *Id.* at ¶ 78. Instead, a physical therapist documented the treatment in WebPT and signed the daily note/billing sheet. *Id.* at ¶ 79. After completing the daily note/billing sheet, the therapist created a fee slip. *Id.* at ¶ 80. As part of his duties, Ernst cross-referenced the fee slips with the WebPT daily notes/billing sheets to confirm that the information matched. *Id.* at ¶ 81. He then scanned the fee slips into a computer and saved them in an HCA billing folder. *Id.* at ¶ 82. He sent the original, physical fee slips to HCA's billing department, which used them to bill Medicare and Tricare. *Id.* at ¶¶ 82–83.

The Second Amended Complaint identifies several physical therapists who participated in this scheme and completed the WebPT records and fee slips. *See* Doc. 54 at ¶¶ 84–85. Ernst provided three examples in his complaint. Docs. 56, 56-1 & 56-2. For each example, the

7

complaint alleges that Defendants knew, or had reason to know, that Medicare (or Tricare) would not pay the claims unless they represented that the services were performed by a licensed physical therapist. Doc. 54 at ¶¶ 88, 91, 96.

**Aquatic-therapy scheme.** Ernst claims that Medicare only covers aquatic-therapy treatments when performed by (or under the direct supervision of) a licensed physical therapist. Doc. 54 at ¶ 103. At minimum, the therapist must be present in the office while the service is performed. *Id.* at ¶ 104. In addition, the pool itself has to comply with certain requirements, including that the therapy provider own, rent, or lease the pool and restrict other access to it during treatments. *Id.* at ¶ 61 (citing Medicare Benefit Policy Manual, Ch. 15 § 220).

Ernst alleges that Defendants submitted Medicare claims for services that did not meet these requirements. Specifically, a College Park PT physical therapist assistant, Samantha Dodd, performed all aquatic-therapy treatments and did so without direct supervision. Doc. 54 at ¶¶ 106–07. No physical therapists were in the building when she performed the treatments. *Id.* at ¶ 114. Despite this, a physical therapist would sign the WebPT records, which stated that Dodd's treatments were provided under direct supervision. *Id.* at ¶ 120. Both Dodd and a physical therapist then signed the corresponding fee slips that were sent to HCA's billing department. *Id.* at ¶ 121; *see* Docs. 56-3 & 56-4. Finally, the complaint alleges that the College Park entities did not have their own pool, or any written rental or lease agreements for the pool. Doc. 54 at ¶¶ 110–13.

**Tricare-assistant scheme.** Ernst alleges that Defendants submitted false claims to Tricare for services performed by physical therapy assistants even though assistants were not authorized providers under Tricare. Doc. 54 at ¶¶ 127–39. An assistant would perform a treatment, but Defendants recorded the treatment using CPT codes designating performance by a physical therapist. *Id.* at ¶ 128–31. Ernst claims that this practice occurred until he notified HCA Midwest's compliance director of the improper billing. *Id.* at ¶ 131. Soon after, "office staff"

were told that patients should be scheduled for days when therapists were available.[6] *Id.* at ¶ 137.

***8-minute-rule scheme.*** Ernst alleges that Defendants submitted claims for payment that did not comply with Medicare regulations for computing time and treatment units. Doc. 54 at ¶ 140–48. Medicare permits billing only in 15-minute increments and rounds down rather than up. Nonetheless, the Medicare Claims Processing Manual, Ch. 5 § 20.2, describes an "8-minute rule," which allows providers to bill for a single 15-minute unit if at least 8 minutes of therapy were provided. *See* Doc. 54 at ¶¶ 62–66. If multiple services are provided on the same day, Medicare permits providers to calculate the number of units based on the total time.[7] The total units are then reapportioned to the services provided, which may have different billing rates. Tiebreakers are resolved in favor of treatments of longer duration rather than treatments with higher billing rates. *Id.* at ¶¶ 66, 141. Ernst alleges that Defendants routinely violated this rule by apportioning units to treatments with higher reimbursement rates rather than treatments of longer duration. *Id.* at ¶ 142.

**2**

Defendants argue that the Second Amended Complaint still fails to "identify a single false claim" submitted to the government. Doc. 68 at 6. Defendants also argue that the complaint fails to plead the four underlying fraudulent schemes with sufficient particularity. Doc. 68 at 17–19. They note that the complaint inappropriately groups all Defendants together without specifying which defendant performed which acts. Finally, Defendants argue that Ernst fails to plead any theory of falsity, fails to plausibly show that any misrepresentations were material, and fails to plead facts showing that the Defendants acted

---

[6] Although not explicit in the Second Amended Complaint, "office staff" appears to refer to staff at the College Park entities, which were in charge of scheduling and administering treatments. *See* Doc. 54 at ¶¶ 12–14, 137.

[7] For example, if a therapist provided 20 minutes of aquatic therapy and 7 minutes of neuromuscular reeducation, Medicare permits using the total treatment time (27 minutes) to compute the number of units (2 units). Otherwise, the provider could only bill for a single unit in this scenario because the neuromuscular reeducation time falls below the 8-minute threshold and the aquatic-therapy treatment rounds down to one 15-minute unit.

with the requisite intent. *Id.* at 26–35. As a result, Defendants ask the Court to dismiss Ernst's Second Amended Complaint.

## II

Defendants' motion to dismiss is granted in part and denied in part. None of the claims against the HCA entities satisfy Rule 8(a)'s pleading standards, so Defendants' motion to dismiss these claims is granted. For the remaining College Park Defendants, Ernst's claims based on the Tricare-assistant and 8-minute-rule schemes fail to satisfy Rules 8(a) and 9(b). But his claims based on the tech and aquatic-therapy schemes do.

### A

The claims against the HCA entities are dismissed because Ernst does not plausibly allege that they acted "knowingly" in submitting false claims. The Second Amended Complaint makes only bare allegations of their knowledge, using collective references to "Defendants" without specifying each defendant's knowledge. *See* Doc. 54 at ¶¶ 87, 90, 95, 97, 126, 139, 148.

These generalized allegations are insufficient for the HCA Defendants because the Second Amended Complaint does not specifically describe what they knew concerning fraudulent billing or how they knew it. Moreover, Ernst alleges significant limitations on their possible knowledge of fraudulent billing. The HCA entities had no means of knowing what to bill for services beyond the information that the fee slips contained. Doc. 54 at ¶ 31 ("[T]here was no other way that the billing department would know what to bill."). And because the fee slips always listed a licensed physical therapist as the provider, the HCA Defendants had no way of knowing whether someone other than the licensed physical therapist—like a tech or an assistant—actually performed the treatments. *Id.* at ¶ 80. There are no allegations that would provide a plausible basis for believing that the HCA Defendants had (or could have obtained) knowledge of fraudulent submission, like back-channel communications or alternative processes for obtaining the requisite information to submit claims. And there are no allegations that the fee slips contained any information, on their face, to suggest overbilling was occurring. Simply put, Ernst has not provided a sufficient factual basis that the HCA entities had any knowledge of misrepresentations in the payment requests they submitted.

10

Instead, Ernst points to Defendants' corporate structure as evidence that the HCA Defendants had knowledge of the fraudulent nature of the bills they submitted to the government. Doc. 76 at 20–22. The Second Amended Complaint alleges that the HCA entities "directed, mandated, tracked and oversaw all submissions of bills" to Medicare and Tricare for services performed by its affiliated entities. Doc. 54 at ¶ 16. Additionally, these entities "promulgated and oversaw the billing practices of" and "established rules and regulations for" its affiliated entities. *Id.* at ¶¶ 18–19. The complaint further asserts that the HCA Defendants "had the duty and obligation" to make sure billing submissions complied with federal laws and "had an obligation and duty to properly oversee and ensure" that they were "properly coding billing submissions." *Id.* at ¶¶ 20–21.

This argument fails primarily because it relies on broad, conclusory allegations without any factual support. *Cf. United States v. Boeing Co.*, 825 F.3d 1138, 1149 (10th Cir. 2016) ("[N]aked assertions, devoid of any evidence of scienter, can't survive summary judgment."). To sufficiently plead scienter, the *qui tam* relator must provide at least some details about statements made or specific actions taken that show a defendant's knowledge or facilitation of an allegedly fraudulent scheme. *Compare id.* (lack of evidence), *and United States ex. rel. Burlbaw v. Orenduff*, 548 F.3d 931, 949–50 (10th Cir. 2008) (same), *with United States ex rel. Groat v. Boston Heart Diagnostics Corp.*, 296 F. Supp. 3d 155, 164–65 (D.D.C. 2017) (finding relator sufficiently plead scienter where she alleged facts to show defendant "engaged in a scheme to encourage non-cardiology physicians to order medically unnecessary tests"), *and United States v. DynCorp Int'l, LLC*, 253 F. Supp. 3d 89, 103 (D.D.C. 2017) (finding government adequately alleged scienter for implied false certification claim based on statements made by defendant's high-level employees about knowledge of a contractual and regulatory violation).

The Second Amended Complaint offers no details about how billing practices were promulgated, what those practices entailed, or what the HCA rules and regulations required of the College Park entities. Nor are there any facts suggesting that the HCA Defendants intentionally promoted fraudulent billing practices or willfully turned a blind eye. Even Ernst's conversations with the HCA Midwest compliance department are not enough. *See* Doc. 54 at ¶¶ 131–38. Beyond the fact that general conversations occurred "about the Tricare billing issues," there are no facts to infer that the HCA Defendants *knew*—within the meaning of the statute—that the College Park entities were submitting

11

false fee slips. *Id.* at ¶ 136. Ernst does not allege that the compliance department employees admitted knowledge or took actions evidencing reckless disregard. The most Ernst alleges is that at some point after the Tricare billing conversations occurred, the HCA Defendants advised College Park "office staff" that Tricare patients should be scheduled only on days when physical therapists were available to provide treatments. *Id.* at ¶ 137. Ernst does not allege that violations continued *after* these conversations. Altogether, Ernst's claims against HCA and HCA Midwest fail for "what is not in the record" concerning their knowledge. *Burlbaw*, 548 F.3d at 949.

### B

For the claims against the College Park entities, Defendants argue that dismissal is once again required under Rules 8(a) and 9(b). Yet for the PT-tech and aquatic-therapy schemes, the Second Amended Complaint fixed the failures of the First Amended Complaint. The other two claims, based on the Tricare-assistant and 8-minute-rule schemes, are dismissed.

### 1

Two of Ernst's claims survive. For both the PT-tech and aquatic-therapy schemes, Ernst has alleged plausible FCA violations with sufficient particularity.

**PT-tech scheme.** Unlike the First Amended Complaint, the Second Amended Complaint alleges facts with sufficient particularity under Rule 9(b) that, taken as true, show a plausible FCA violation. It is clear that Ernst alleges a theory of legal falsity based on implied false certification: Defendants impliedly represented compliance with Medicare and Tricare reimbursement policies when they submitted payment requests.

The Second Amended Complaint contains sufficient factual allegations regarding the who, what, when, where, and how of the alleged PT-tech scheme. *See United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1171–72 (10th Cir. 2010). Ernst named techs and therapists involved and listed examples of treatment codes used. He also described instances of noncompliant treatment. A physical therapist created and signed the fee slips without disclosing that a tech had actually performed the services. And because HCA's billing was based solely on the fee slip information, it is plausible that Medicare and

12

Tricare received requests for reimbursement that falsely claimed a physical therapist had performed treatment when, in fact, a tech had. This particularity is sufficient to form a reasonable inference that the College Park Defendants knowingly caused false claims to be submitted to Medicare and Tricare for payment.

Defendants argue that the Second Amended Complaint is insufficient because it fails to include the dates of the alleged claims submitted, the amounts billed to the government, or the statements or codes used in specific claims. Doc. 68 at 10. Ernst, Defendants argue, has only "alleged that *internal* records and fee slips misstated the individual who provided the relevant services" and not that the actual claims to the government did. Doc. 68 at 22. But Ernst need not provide all of these details to satisfy Rule 9(b)'s particularity requirement. *See Lemon*, 614 F.3d at 1173. "The federal rules do not require a plaintiff to provide a factual basis for every allegation. . . . Rather, to avoid dismissal under Rules 9(b) and 8(a), plaintiffs need only show that, taken as a whole, a complaint entitles them to relief." Here, all that is required of Ernst is that he plead facts with enough specificity to put Defendants on notice of the nature of the claim. *United States ex rel. Polukoff v. St. Mark's Hosp.*, 895 F.3d 730, 745 (10th Cir. 2018). Stated another way, Ernst need only plead facts about the underlying schemes with sufficient particularity to support a reasonable inference that Defendants submitted false claims. *Lemmon*, 614 F.3d at 1171–73. His allegations are enough to support the reasonable inference that, after receiving false claims from the College Park Defendants, the HCA entities mechanically submitted false claims—as a factual matter—to Medicare and Tricare in the usual course. The opposite inference—that the HCA entities never billed Medicare and Tricare for the relevant fee slips—would be unreasonable on the facts currently alleged. *See United States ex rel. Chorches v. Am. Med. Response, Inc.*, 865 F.3d 71, 85 (2d Cir. 2017) ("[I]t is highly implausible to suggest that the resulting [falsified] records were never submitted . . . for reimbursement.").

Defendants maintain that Ernst cannot rely on inferences and instead must pled facts about the actual claims submitted to the government. Doc. 68 at 9–11. For support, Defendants cite recent district court cases that purport to apply a stricter standard (based on the pre-*Twombly* opinion in *United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702 (10th Cir. 2006)). *Id.* at 11–12. But those cases are not binding on this Court, nor are they directly relevant to the facts of this case. None of them addressed a corporate structure

13

like the one here. None addressed the Tenth Circuit's recognition that plaintiffs may be hindered in pleading details about actual claim submissions due to internal corporate operations. For example, in *United States ex rel. Clark v. United Health Group, Inc.*, which involved a parent company and subcontractors, the plaintiff worked for the same defendant alleged to have submitted false claims.[8] No. 13-00372, 2016 WL 9777207, at *1 (D.N.M. Sept. 22, 2016). Here, Defendants' corporate structure housed billing operations in separate entities from those that hired and trained employees, oversaw and directed scheduling for patient services, and directed completion of WebPT records and submission of fee slips for eventual billing. The latter operations were housed in the College Park entities, where Ernst worked and to which his experience was limited. It is unsurprising, therefore, that Ernst did not have access to actual claim submissions.

For this scheme, Ernst also sufficiently pleads the FCA's materiality element that the falsehood be material to the government's payment decision. This element focuses on the likely or actual behavior of Medicare and Tricare when confronted with a claim. *See Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2002 (2016). Because both Medicare and Tricare policies require that a physical therapist perform the services, it is plausible that the failure to disclose that techs had performed the services affected the programs' behavior. *See Escobar*, 136 S. Ct. at 2000 (omitting critical qualifying information is considered an actionable misrepresentation).

Against this, Defendants argue that Ernst's reliance on nonbinding interpretive guidelines and policies is insufficient to support materiality. Doc. 68 at 26–27. But again, a misrepresentation is considered material when it is "*capable* of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4) (emphasis added). The fact that both insurers have guidelines stating that physical therapists must perform services rather than techs or assistants sufficiently provides a basis for materiality. *See, e.g.*, *Polukoff*, 895 F.3d at 743 (basing materiality on Medicare and Medicaid guidelines); *United States ex rel. Prather v.*

---

[8] The plaintiff was a "Senior Investigator within the Special Investigations Unit (SIU)" for the defendant and tasked with investigating allegations of fraud and abuse. *United States ex rel. Clark v. United Health Group, Inc.*, No. 13-00372, 2016 WL 9777207, at *1 (D.N.M. Sept. 22, 2016).

*Brookdale Senior Living Communities, Inc.*, 892 F.3d 822, 836 (6th Cir. 2018) (same).

Finally, Ernst plausibly alleges that the College Park Defendants knowingly caused false claims to be submitted to the government. College Park Family Care employed techs who worked at College Park PT. The Defendants trained and scheduled their techs to perform treatments on Medicare and Tricare patients. Doc. 54 at ¶¶ 74–76. Even though techs performed treatments, they were instructed not to enter any information on the WebPT system. *Id.* at ¶ 78. Instead, a physical therapist—who did not perform the treatment—entered the information and signed the WebPT note. *Id.* at ¶ 79. These facts are sufficient to suggest intent and therefore plausibly allege knowledge.

**Aquatic-therapy scheme.** For the aquatic-therapy scheme, Ernst has also cured his earlier pleading deficiencies. Ernst pleads a viable FCA claim under a theory of implied false certification. He alleges facts regarding the who, what, when, where, and how of this second alleged scheme. *See Lemon*, 614 F.3d at 1171–72. First, an assistant, Samantha Dodd, performed aquatic therapy for patients in a noncompliant pool without a physical therapist's direct supervision, despite Medicare policy disallowing reimbursement for unsupervised aquatic services. Doc. 54 at ¶¶ 110–18. Dodd then created records of her treatments in the WebPT system that stated the treatments were performed under direct supervision. *Id.* at ¶ 120; *see* Doc. 56-3 at 3. A therapist signed the WebPT records, which were transferred to College Park Family Care fee slips. Doc. 54 at ¶ 121. The fee slips contained both Dodd's and a therapist's initials without disclosing the therapist's absence during the therapy. *Id.* The fee slips were then sent to HCA's billing department for billing. *Id.* These facts, taken together, are enough to allege a theory of implied false certification with sufficient particularity. *See Escobar*, 136 S. Ct. at 1995 (holding that a claim that fails to disclose the defendant's violation of a material statutory, regulatory, or contractual

15

requirement is a misrepresentation rendering the claim false or fraudulent).[9]

Still, Defendants counter that the Second Amended Complaint fails to satisfy Rule 9(b) because it does not identify any particular false certification or any false statement in an actual claim for payment. Doc. 68 at 13. For the same reason that this argument failed for the PT-tech scheme, it fails here. Under an implied false certification theory, it is unnecessary to allege an express certification or a particular false statement. *Lemmon*, 614 F.3d at 1168–69. As long as a defendant knowingly violates a condition of payment and attempts to collect that payment, liability attaches. *Id.* Moreover, Ernst need not point to actual claims for payments: He has pled the underlying scheme with sufficient particularity to give rise to a reasonable inference that the College Park Defendants submitted false claims for reimbursement. Here again, it is important to consider Defendants' corporate structure and the limited access Ernst had to HCA's billing operations. *See Polukoff*, 895 F.3d at 745. By sufficiently connecting the WebPT records with fee slips, and by explaining the relationship between the fee slips and the billing department, Ernst has provided an adequate basis for his FCA action.

Ernst has also satisfied the materiality element for the aquatic-therapy scheme. The Second Amended Complaint provides facts supporting the conclusion that the alleged falsehoods went to the essence of the bargain with Medicare and Tricare. *See* Doc. 51 at 18 (citing *United States ex rel. Janssen v. Lawrence Mem'l Hosp.*, 949 F.3d 533, 541 (10th Cir. 2020)). Whether properly licensed personnel performed the services is significant—as evidenced by Medicare's explicit guidelines. *See Polukoff*, 895 F.3d at 743.

Defendants counter Ernst's materiality allegations on two grounds. First, they criticize the Second Amended Complaint's failure to allege that Medicare has denied payments in the past for aquatic services

---

[9] In dismissing Ernst's First Amended Complaint, Judge Lungstrum found that the complaint failed to identify a theory of liability for the aquatic-therapy scheme. Doc. 51 at 13. Although the First Amended Complaint alleged that Dodd provided services without supervision, it failed to allege that this conduct resulted in a false claim or misrepresentation made to the government. *Id.* The Second Amended Complaint cures this deficiency by detailing the implied false certification carried out through WebPT records and fee slips. Doc. 54 at ¶ 120.

performed by unsupervised assistants. Doc. 68 at 26. But a history of past denials for similar violations is only one relevant factor when determining materiality. *Janssen*, 949 F.3d at 541. The complaint provides enough factual basis to support its claim that the alleged misrepresentations were material, even without alleging previous claim rejections. *See United States ex rel. Escobar v. Universal Health Servs., Inc.*, 842 F.3d 103, 112 (1st Cir. 2016) (stating that requiring plaintiffs to learn and allege the government's payment practices, which are not dispositive, at the motion to dismiss stage is illogical). Second, Defendants argue that Ernst relies on nonbinding guidance and policy from Medicare, rather than statutory violations, to show materiality. Doc. 68 at 26–27. But this argument fails for the same reasons addressed with regard to the PT-tech scheme. The ultimate inquiry "of materiality is some quotient of potential influence in the decision maker," not whether a legally binding authority dictates the government's response. *Janssen*, 949 F.3d at 540. A guideline—which the government itself released—stating that certain services must be performed under direct supervision is enough to support the materiality of an implied false certification. *See Prather*, 892 F.3d at 834–36 (relying on the Medicare Benefit Policy Manual to show the alleged misrepresentation went to the essence of the bargain).

Finally, Ernst has plausibly alleged that the College Park entities acted knowingly. College Park Family Care employees, working at College Park PT, directed physical therapists to sign off on WebPT notes that stated they had directly supervised aquatic therapy treatments. Doc. 54 at ¶¶ 119–22. Given that the physical therapists were not present for these treatments and yet signed notes stating otherwise, it is reasonable to infer that the College Park entities knowingly "caus[ed] to be presented" false or fraudulent claims for payment to the government. 31 U.S.C. § 3729(a)(1)(A).

### 2

Two of Ernst's claims fail. For both the Tricare-assistant and 8-minute-rule schemes, Ernst has not alleged plausible FCA violations with sufficient particularity.

**Tricare-assistant scheme.** The Second Amended Complaint did not cure the deficiencies noted in Judge Lungstrum's order as to the Tricare-assistant scheme. *See* Doc. 51 at 13–14. In contrast to the PT-tech and aquatic-therapy schemes, the Second Amended Complaint's allegations of the Tricare-assistant scheme are conclusory and lack

particularity. *See* Doc. 54 at ¶¶ 127–39. The complaint offers no examples of WebPT records, fee slips, specific dates, or instances of non-compliant treatment. Instead, the complaint names all assistants employed during Ernst's employment and alleges that they all provided services to Tricare patients. *Id.* at ¶ 130. The complaint then asserts that Defendants "regularly billed for services performed by [assistants]," without specifying whether Defendants did so for all or only some of the assistants. *Id.* at ¶ 131. Similarly, the complaint does not link the assistants to particular services or to improper fee slips. Rule 9(b) requires more. All told, Ernst's allegations for this scheme lack sufficient particularity of the "who, what, when, where, and how." *Lemmon*, 614 F.3d at 1171–72. *See* Doc. 51 at 13–14 (noting, among other deficiencies, the failure to identify a particular occasion).

***8-minute-rule scheme.*** Finally, the 8-minute-rule scheme also fails under Rule 9(b). Little changed between Ernst's First Amended Complaint and his Second Amended Complaint. *Compare* Doc. 29 at ¶¶ 158–164, *with* Doc. 54 at ¶¶ 140–48. The Second Amended Complaint still lacks details about how the units-per-treatment information moved from daily notes/billing sheets to fee slips (and later to HCA's billing department). The complaint's sealed exhibits only show daily notes/billing sheets. Docs. 56-5 & 56-6. In contrast, the PT-tech and aquatic-therapy schemes describe the link from daily notes/billing sheets to fee slips to HCA's billing department. Doc. 54 at ¶ 121. For those schemes, the complaint alleged that fee slips included the identity of the therapist who supposedly performed the treatment, *see id.*, and that the therapist's identity made the eventual claims false because that identity was necessary to associate a treatment with a licensed therapist for billing purposes (via the National Provider Identifier). And according to Ernst, HCA's billing department had no other way to verify those identities when submitting claims. So for those schemes, it is reasonable to infer that the fee slips themselves provide an adequate basis to infer that false claims were submitted.

But the 8-minute-rule scheme lacks a similar causal chain. The complaint does not allege facts about how the unit-apportionment calculations made it from a WebPT record to a fee slip. It is even possible that the corresponding fee slips *corrected* the daily notes/billing sheets' unit apportionment to follow the guidelines (after all, the WebPT record is separate from the fee slip). Without more details about how the unit-apportionment information was transmitted to the billing department and about how the billing department used that information, the

18

complaint fails to satisfy Rule 9(b) and the "who, what, when, where, and how" test. *Lemmon*, 614 F.3d at 1171–72. Thus, on the facts alleged, Ernst has not "provide[d] an adequate basis for a reasonable inference that false claims were submitted." *Polukoff*, 895 F.3d at 745.

### III

Based on the foregoing, Defendants' motion to dismiss is granted in part and denied in part.

It is so ordered.


Date:  November 19, 2021       s/ Toby Crouse
                                                    Toby Crouse
                                                    United States District Judge